## HILLIARD FLUME AND LUMBER CO. *v.* WOODS.

EVIDENCE.—Although an error was committed by the district court in admitting certain documentary evidence, yet where it clearly appears from the record that the jury could not have been misled thereby, the judgment of the court below should not be reversed on that ground.

MEASURE OF DAMAGES.—Where certain railroad ties of plaintiff had been wrongfully converted and sold by defendant: *Held,* that plaintiff was entitled to recover the highest market price for the same that was paid at any time between conversion and judgment.

JURISDICTION OF APPELLATE COURTS—WEIGHT OF EVIDENCE.—The supreme court should not reverse a judgment of a lower court because it might or would have arrived at a different conclusion upon the evidence adduced. The appellate court should only reverse where there is no testimony to sustain or rebut a material allegation, or where it is apparent that the jury have been controlled by improper motives, or have misunderstood the evidence.

ERROR to the District Court for Uinta County.

A full statement appears in the opinion.

*Wm. G. Tonn,* for plaintiff in error, contended: 1. That the verdict was not sustained by sufficient evidence, and was contrary to law; 2. That the jury erred in the assessment of damages; 3. That the court erred in permitting an affidavit made in another action to be introduced in evidence by one of the witnesses for the defense, and in the admission of other testimony; 4. That the court erred in the instructions to the jury; 5. That the court erred in overruling the motion for a new trial, and cited: *Clark* v. *Skinner,* 20 John. 465; *Pattison* v. *Adams,* 7 Hill, 126; *Bond* v. *Mitchell,* 3 Barb. 304; *McCurdy* v. *Brown,* 1 Duer, 101; *Hooben* v.

*Bidwell*, 16 Ohio, 509; *Oliphant* v. *Baker*, 5 Denio, 379; *Terry* v. *Wheeler*, 25 N. Y. 520–5; Benj. on Sales, 315, 774; Sedg. on Damages, 583, 591.

*H. Garbanati*, for defendant in error, cited in opposition: Hilliard on New Trials, sec. 2, p. 21; sec. 3, 446; also sec. 10, p. 449; sec. 19, pp. 451, 456; 1 Pars. on Contr. 529, 532; *Graff* v. *Fitch*, Am. Rep. 85; Laws of Wyoming, p. 358, sec. 2; 1 Pars. on Contr. 527; Lang. on Sales, 153–8;5 1 Greenleaf, sec. 27; Hilliard on Torts, p. 69, sec. 27; 2 Addison on Torts, 559; Sedg. on Damages; 478–9.

By the Court, PECK, J. This is an action of trover for the conversion of three thousand railroad ties of the value as alleged in the petition below, of six hundred dollars; the answer is the general denial; the trial was by jury, and a verdict rendered for the plaintiff below, for five hundred and forty-two dollars and fifty cents, interest included. Under the instruction of the court, I now read its opinion, having prepared it upon a scrupulous examination of the bill of exceptions, of which the exceptions and the matters on which they rest cover over seventy pages.

The first exception is to the admission of the following question, put to William K. Sloan, a witness called by the plaintiff, on his re-direct examination, namely: "What were ties then selling for at the railroad? The exception is urged upon the proposition that the rule of damages in trover allows a recovery for the highest market price or value attributable to the property, between the conversion and the trial, but confines it to the highest at the place of conversion. Granting this proposition as true, let us see what conclusion it leads to. A market, in the sense of a rule of charges, is either a district of country in which trade in one or several articles is habitually conducted as to furnish a criterion of value of the thing or criteria of the values of the things there sold, or it is the point of trade to which the trade of a district centers.

As the evidence stood when the exception was taken, it

tended to show, and for the purpose of testing the exception, must be treated as showing that Bear river was the water route for the transportation to market of the cutting of the timber lands lying upon its border, and it is judicially known to pass from those lands to Hilliard through a wild and thinly-settled country; that in the spring and early summer of 1876, Woods owned and possessed three thousand ties, lying at Hayden's Fork, upon the river, separate from all others; that the company knew that he had the ties there, and could have ascertained their identity; that Woods, being such owner and so in possession, and the ties so separated and susceptible of identification, the company, with full knowledge of these particulars, artfully appropriated and converted the ties, and thereupon, through its agent, the Evanston Lumbering Company, took the ties and floated them down the river to the Big Bend, so called, of the river, which is about three miles east of Evanston, loading them at the tie switch of the Union Pacific Railroad, this switch being in the side track by which ties supplied to the road are received and distributed over it; that the road created the only market for ties existing in that part of the country; and that the entire tie manufacture upon that water route was for the supply of the road; that Coe & Carter, as supply contractors, collected for and delivered to the road all the ties used by it, and the other parties engaged in the tie trade along that route supplied directly or indirectly to them; that the Hilliard Flume and Lumber Co., having received the ties in question from the Evanston Lumbering Co., at the Big Bend or tie switch, sold and delivered them in July or August, 1876, to Coe & Carter.

That evidence further shows that the Hilliard Flume and Lumber Company was engaged in the tie trade upon this route, manufacturing ties in the timber lands, also obtaining them from sub-contractors; that the Evanston Lumbering Company was engaged in it on this route; that as early as January, 1875, Burris & Bennett were under a contract,

with the Hilliard Flume and Lumber Company to supply it with ties upon this route; that in or about the spring or early summer of that year, Woods conditionally sold three thousand to Burris & Bennett, to apply upon their contract with the Hilliard Flume and Lumber Company; but that evidence does not tend to show where these several contracts were made, nor where the different lots of ties respectively embraced by these contracts were when the contracts were made, with the single exception of those conditionally sold, nor, with that exception, whether the ties were cut, nor, with the exception of the two contracts of Burris & Bennett, where the deliveries were to be made. From the nature of the case, one of two things must follow —either that the whole water route between the timber lands and the ultimate point or points of delivery at or along the route was a tie market, or that the big bend at the tie switch was the, or a, market, as being the, or one of the, objective points of supply for the route, and therefore to its district a point or the point to which its trade centered, therefore its center, or one of its centers, of trade. This point necessarily prescribed, so far as can be seen from the evidence, the most definite, accurate and reliable standard of price in the trade between it and the timber lands, and we therefore regard it as the market. Now, the proposition on which the exception is urged evidently treats Hayden's Fork, and therefore the *locus* of the conversion, as the place to furnish the value of the property converted, conceding this the value at the time of the sale and delivery to Coe & Carter, in July or August following, or during these months, the point or period of time embraced by the question, would be the price of such ties then prevailing at the bend or switch, less the price of transportation from the Fork; but if that rule prevails another must be complied with.

The company subjected itself to its willful tort to the sale, that having been added to the value of the transportation, it did it for the benefit of the owner, otherwise it could

commit the tort and escape one of its consequences: Sedg. on Damages, 483 and 484. To so familiar a principle, further citation is unnecessary. Had Woods recaptured or replevied the ties after this addition of value, instead of suing in trover, he could have had them as he found them, and would not have been compelled to account to the company for the added value. He has the same exemption in trover, in which he may recover the value of what he might have had in another form in the things themselves. Hence the question objected to was strictly competent, for it simply called for the price prevailing at the tie switch where the company sold to Coe & Carter, which was calling for the Hayden Fork price, plus the transportation. The proposition, however, on which the exception is urged, proceeds upon a supposed American rule. Whether there is such a rule, or, if one, whether the proposition accurately states it, it is unnecessary to inquire. The English rule governs this court; according to that, where the price or value of the converted property fluctuates between the conversion and the trial, it is held proper that the plaintiff should recover the highest market value, which the property or like property has reached in its intended market during that interval; and this upon the two-fold ground of making him good and of preventing the converter from profiting from his own wrong; leaving it, however, to the jury to allow, in its discretion, the highest damages under this principle, or lower damages: Sedgwick on Damages, 476 to 479, 494 to 495.

That criterion would have enhanced the price at the tie switch at the time pointed at in the question excepted to, the transportation upon another principle already explained included. The price of the English rule becomes more dear when we consider that the water route and the market at the bend or switch were as open to the plaintiff as to the company when the latter unlawfully attempted to deprive him of that opportunity for profit, and it was his right to be restored to what it thus endeavored to take from him; and the competency of the question is rendered still more

clear by the fact that the cross-examination preceding it had developed from the witness the fact that Coe & Carter, as the tie suppliers of the road, created the market, and when they were not buying, it was down. It was entirely consistent at this point for the plaintiff to ascertain how it was when they were buying. Being competent, the question was relevant.

The witness answered that the price was forty cents for ties and twenty for culls on a two years' credit, therefore the defendant moved to strike out the answer as incompetent and irrelevant; the motion was overruled and an exception taken.

The answer was competent, and therefore relevant, because it furnished something of a standard by which to arrive at a cash value at that time. Louis Bennett, a witness for plaintiff, was asked by him how it happened that he, plaintiff, used the brand B. and BB. for the ties, the question was objected to as irrelevant, admitted, and an exception taken; the ownership and possession of the ties at the time of the alleged conversion were in issue, the question went directly to the identity, and was relevant.

In rebuttal the plaintiff offered in evidence a document purporting to be a copy of an affidavit made by W. K. Sloan, on the behalf of the Hilliard Flume and Lumber Company, in a suit of replevin instituted by the company against Burris & Bennett, in Utah county, in the third judicial district of Utah, for certain railroad ties; its admission was objected to as not being properly authenticated; the objection was overruled and an exception taken. The document is not properly authenticated, the attestation of the clerk which is upon it being unverified by an accompanying certificate of a judge of the court in which the original purported to be as required by U. S. Rev. Stat., p. 170, sec. 905; and though Sloan, in connection with the offer admitted on the stand that he had made at Salt Lake city an affidavit for the company against Burris & Bennett, he does not admit the making of the affidavit in ques-

tion. The objection, therefore, was sound, and should have been sustained; but the error was cured by the fact that after the reading of the document Sloan was recalled and distinctly admitted its verity.

The defendant further objected to the document upon the ground that it was an attempt by the plaintiff to impeach his own witness, meaning Sloan; that it contained nothing contradictory of any of the testimony of the defense; that it was not rebutting and was irrelevant. The affidavit conflicted with no evidence which had been given; Sloan as a witness for the plaintiff, therefore, cannot be said to have been employed by the plaintiff to impeach his own witness. It did, however, conflict with evidence of Sloan given as a witness for the defense. The plaintiff, in his opening, introduced evidence tending to show that Burris & Bennett had contracted with the defendant to deliver ties to it at its feeder, which was on the stream at or below the Fork; and under this contract, in the spring of 1875, put into the Fork some twenty-five thousand to twenty-nine thousand ties, and branded them B. and BB., in order to distinguish them as their contract ties; that they embraced the three thousand ties which he had conditionally sold to them, as above stated, and which had been put into the stream by them above and at the rear of the others, and which were marked in the same way; and while the conditional sale was in force, that Burris & Bennett began to float or drive the whole lot, so collected in the Fork, down to the feeder, when the water failed and the drive was, in driving parlance, "hung up;" that while so hung up, Burris & Bennett, failing to pay for the wood ties and acquiring the title to them, agreed with him to cancel the sale and return them; and that by way of a cancellation to return, three thousand of like ties should be counted off from the rear of the drive as his, and in July of the same year this was done, and the three thousand so counted off and delivered there by Burris & Bennett to and accepted by him as the restored ties, and they were then physically separated from the rest of the drive a distance of

fifteen to twenty feet and cross-piled upon the bank, the remainder of the drive left as before, and consisting of the Burris & Bennett contract ties; that the drive. continued so hung up until in June, 1876, when the Evanston Lumbering Company, as the agent of the defendant, under a special contract and by its special direction, given for the purpose of having the contract executed, took possession of all the B. & BB. marked ties at the Fork and upon the stream and drove them down for the defendant. Beard testified for the defense that he was the defendant's agent at the feeder or boom, authorized to contract with Burris & Bennett for ties for the company, and to receive them and pay for them in provisions and other supplies out of the company's store at the feeder, which was kept there to supply tie and lumbermen, and the charge of which was a part of his agency, and see to their boarding, that as such he contracted with them for ties.

That afterwards in January, 1875, Woods contracted the three thousand ties to Burris & Bennett, to be delivered by them to the company under their said contract with it, and deliver them over to Burris & Bennett, accordingly and thereupon the latter delivered them to him as its agent, and after they had been so delivered to him, that they were branded with the B. & BB. mark to distinguish them as the company's ties as received from Burris & Bennett under its contract with them.

Beard further testified that the contract so made between Burris & Bennett and the company, before the Woods contract was made with them, called for a delivery by him to the company at the boom or feeder. That after Woods had so sold to Burris & Bennett, the original contract between Burris & Bennett and the company, the company was verbally changed, so that the company might receive their ties wherever they were, whether in the timber or between it and the feeder or along the stream at different prices, but to be paid for at the full original price for what he should deliver at the feeder; that under the contract so modified, the

company received and took into its possession all the Burris & Bennett ties in the timber along and in the stream, and had them marked with the same B. & BB. brand, and with its own branding iron furnished for the purpose and for the same purpose of distinction as in the case of the Wood ties. After the defendant had thus in its defense introduced evidence to show, and tending to show, that all the B. & BB. ties had been delivered and received into its possession under its contract with Burris & Bennett, by the time of the hanging up of the drive in August, 1875.

Sloan was put on for the defense and testified, that in the fall of 1875 he went up to the Fork and rode along the entire drive, whereever the B. & BB. ties were, inspecting them, and saw no ties separated at the upper or rear end from the rest, and that in his opinion he must have seen such a separation had there been one; that on the other hand, all the ties seemed to be massed together in the stream.

The very object of this testimony by Sloan was to refute the plaintiff's evidence, so far as it tended to show that the sale by Woods to Burris & Bennett was conditional, that the condition was not performed, and that as a consequence the contract had been cancelled, and his three thousand ties restored to him by a counting off and separation from the rear of the drive.

Wherefore, on the other hand, all the ties at the upper end lay in an undistinguishable mass with the rest of the ties, as the company's ties, and that the ties in question had been left in its possession as originally delivered to it. This was evidently to corroborate Beard, and treated the ties as then in possession of the company. No evidence was adduced for the defense to show that the possession of the company had prior to May 25, 1876, shifted to Burris & Bennett, and on the face of the defendant's evidence it appeared as a fact that they had received possession prior to and retained it up to that date. This was the status of the testimony; the plaintiff began to rebut, and under the rebuttal he called Sloan as a witness, and his

evidence given at this time implies that it was in answer to
an inquiry, or inquiries, whether he had ever testified that
the company had not received possession from Burris &
Bennett under the contract. This examination, however,
was manifestly to lay the foundation for introducing the
affidavit, and was for that purpose· indispensable. He
answering in the negative, the foundation was laid for in-
troducing the instrument. It was introduced, and contra-
dicted his evidence given for the defense, because it stated
that on the twenty-fifth day of May, 1875, the possession
was in Burris & Bennett. But the affidavit is not merely
the declaration of Sloan. It is the declaration of the com-
pany in a suit instituted by it to obtain the possession of
the ties as then held by Burris & Bennett, and was there-
fore pertinent as contradicting its defense as contained in
the testimony of Beard. The affidavit was therefore con-
tradictory of material evidence adduced for the defense,
was relevant and rebutting. In the rebutting the plaintiff
offered an order for four hundred and thirty dollars, dated
March 22, 1875, drawn by Burris & Bennett in his favor
on the company, and accepted by Beard; the offer was ob-
jected to as irrelevant, not rebutting and incompetent, was
allowed, and an exception taken. Beard as a witness for
the defense, in addition to his testimony as to his agency
·for the company and its extent, his contracting with Burris
& Bennett for ties, and the subsequent contract between
them and Woods for the ties of the latter to be delivered
to Burris & Bennett, to be applied upon their contract
with the company, and to their being so delivered; all this
shows that the Woods ties were owned and possessed by
the company when they drove them to the Bend, also testi-
fied that after these ties had been so delivered to the com-
pany he, as such agent, supplied out of the store sundry
provisions to Woods on orders of Burris & Bennett
towards payment of the ties, and entered them upon the
store book, in corroboration of his testimony producing
such a book.

In the rebutting, Woods testified that on March 22, 1875, he sold to Burris & Bennett a pair of mules, took in payment for them the order in question, and with the understanding that he was to get provisions upon it on their account from the store; that Beard accepted it, and that he did get provisions upon it accordingly; and that the provisions which he got there, and which Beard had sworn to as obtained of him, were got on that order, and not on account of his ties.  This testimony by Woods was clearly rebutting, and very properly not objected to.  At this point the order was offered and correctly admitted, because it went in direct confirmation of the testimony just given by him; it was relevant, rebutting and competent.

The plaintiff requested the court to charge that possession of the ties was *prima facie* evidence of title, and that should they find that he was in possession when the defendant drove them from the Fork, the latter must have a preponderance of evidence to prevent a recovery.  The request was complied with, and the defendant excepted.  The request was properly granted.

The plaintiff next requested the court to charge that if the jury should find that Woods owned the ties and the defendant converted them, it was not necessary to find that they were in the possession of the plaintiff at the time of the conversion, meaning to entitle the plaintiff to recover.  The request must be construed in the light of the evidence relating to it.  It required the jury to find two distinct facts, ownership in the plaintiff and a wrongful conversion, as the conditions of a verdict for him.  If, under any tendency of the evidence the jury might have found these facts, the request was proper.  It was a starting point on both sides, that the plaintiff originally owned the ties.  The jury might have rejected the evidence of Beard as to an arrangement by which the title and possession of the ties was claimed to have passed to the company, and have found that the plaintiff made a conditional sale and delivery, just as the evidence on his side tended to show.  If they so

found, they found as attributes of the sale that the delivery under it was conditional, and the credit and possession allowed to the vendees were terminable at the plaintiff's will, the right to immediate possession thus remaining in him, drawing after it a constructive possession.

The jury might next have found that the actual possession so passed to the vendees was not reclaimed, as the plaintiff's evidence tended to show. They must then have found the fact as claimed by the evidence of the defense, as well as admitted by its principal manager, Sloan, in the plaintiff's opening case. While the possession was so left with the vendees, the defendant appropriated the property at the Fork in the driving season of 1876, as its own actual property, drove it to the Bend as such, and as such sold and delivered it to Coe & Carter, either of which acts would have constituted a wrongful conversion committed upon the plaintiff's right of possession. Or the jury might have gone further, and found that after the conditional sale and delivery to Burris & Bennett had been made, as aforesaid, the contract was cancelled, and the ties restored to Woods, and thereupon piled upon the banks, apart from the rest of the drive; and, in July, 1875, just as the evidence on his part tended to show, and have also found that in the fall following, when Sloan inspected the drive, they had, by some interference, though unexplained, been placed back into the drive, and, when he saw them, being mixed in with and as a part of the drive, and had further found that Burris & Bennett had not delivered any of the drive to the defendant. Had the jury gone so far in their conclusions, they would have found that they had gone back into the actual possession of Burris & Bennett, though still in the constructive possession of Woods; next finding the several acts of conversion committed, as aforesaid, by the defendant, they would have found a wrongful conversion committed upon the plaintiff's right of possession. We think that the request was properly granted.

The plaintiff requested the court to charge that if the jury

should find that defendant was to have furnished Woods with provisions or other property, on condition that he turned over his ties to Burris & Bennett, they must find that the defendant complied with its condition before it could acquire any right in the ties, and that the ties were first turned over by Woods and afterwards by Burris & Bennett to the defendant. The request was granted, and defendant excepted. There was no evidence on the part of the plaintiff, tending to show any such contract; that on the part of the defense tended to show only a contract of sale as to which the defendant would at most only be conditionally liable to Woods for such credit, if any, as Burris & Bennett might have with them. The request contemplated an absolute contract between Woods and the defendant composed of reciprocal conditions, and requiring contemporaneous performance. No evidence tended to show such a contract. It was, therefore, abstract and inappropriate. It was improper to grant it, but the error could not have misled the jury, who must be supposed to have understood the evidence as accurately as we do, was harmless, and the refusal not ground for reversal.

The plaintiff requested the court to charge that the measure of damages was the highest market value of first-class quality of ties between the allged conversion and "this time," meaning the time of the trial, with interest; the request was granted, and the defendant excepted. We have already shown that the request was correct as to the market rate, and the period during which the plaintiff might apply it. In the absence of any proof as to the quality of the ties having been established, the law would presume that the ties were of the best quality: Sedg. on Dam. 475. There was no evidence to the contrary, and the presumption held. Moreover, the plaintiff testified that they were good. This was not denied, and stood conceded. On the argument, the counsel for the plaintiff in error, explained to us, that there were two classes of ties, the standard and the culls, which are below standard. The plaintiff's remark, that his

ties were good, plainly meant that they were standard ties. The request referred to these good ties. We think that this request was properly granted.

The plaintiff requested the court to charge, that if there was a contract made in the cabin of Woods between him, Burris & Bennett, and the defendant, by which he was to turn over his ties to Burris & Bennett for defendant's benefit, they must find the contract was executed; or if conditional, that the conditions were complied with by Burris & Bennett and the defendant. The request was granted, and an exception taken. We think that it was properly granted, and for reasons too obvious to require explanation.

The plaintiff requested the court to charge that the allegation of a delivery of the ties by Woods to Burris & Bennett, and by the latter to defendant, was material, the onus of establishing it rested upon the defendant; the request was granted and an exception taken, but the request was obviously correct.

The plaintiff requested the court to charge that statements made by Bennett, repugnant to his testimony, might be considered by the jury as to his credibility, but was not binding on the plaintiff, nor to be treated as his admissions. The request was granted and an exception taken, but the request was obviously proper.

The defendant requested the court to charge that if Woods sold the ties to Burris & Bennett, to be sold and turned over by them to the defendant under their contract with it, and they did so sell and turn them over, the plaintiff could not recover. The court refused so to charge, and the defendant excepted. Had the request been based upon the finding of the jury of an absolute contract of sale by Woods to Burris & Bennett, such as Beard's evidence tended to show, it would have been correct; but had the court granted the request, the jury, finding that the sale and delivery by Woods were conditional, as the evidence on his part tended to show, would have been obliged to return a verdict for the defendant. Such a charge would have been erroneous, be-

cause the condition in the sale and delivery would have followed the delivery of the property and kept the title in Woods until the conditions had been satisfied. The request was therefore properly refused. The defendant requested the court to charge, that if the jury should find that the plaintiff agreed with Burris & Bennett, in the presence of defendant's agent, to sell the ties to Burris & Bennett, and the defendant by its agent then and there agreed to pay the plaintiff for the ties, on order from Burris, in money or merchandise, and did pay the plaintiff any goods on said account, and received the ties on the Burris & Bennett contract, the plaintiff could not recover unless the defendant had notice of a condition in the sale to Burris & Bennett by which the ties were to remain his until paid for. The request defined an absolute contract between plaintiff and defendant, by which on their receiving the ties they were bound to pay him for them, which means, in fact, on the simple production of an order or of orders from Burris & Bennett to that amount, and on which contract the plaintiff could have sued the defendant for the full price on failure to honor the order or orders, and therefore assumed that there was evidence tending to show such a contract. But there was no such evidence. The evidence on the plaintiff's part as to the contract for the three thousand ties was all the other way. The evidence on the defense as to the contract for them was all from Beard, and precisely the reverse.

His testimony was in effect positive and distinct that Woods agreed in his presence to sell and deliver ties to Burris & Bennett, to be turned in upon their contract with the company, and that no notice was given to him of the alleged condition in the sale; but that he refused to bind the company to Woods for any of the price; that, on the other hand, he only promised for the company to pay him on the order of Burris & Bennett, provided that on the presentation of the orders Burris & Bennett had a credit with the company out of which to satisfy them. The effect

of this was to leave Woods just where he would have stood with the orders of Burris & Bennett in his hand, and without any communication with the company, except to present them—that is to say, the orders would have operated as assignment to him, when notice as to company of whatever funds upon their account he would have found in the hands of the company belonging to Burris & Bennett at the time or times of presenting the order. The request was properly denied.

The defendant requested the court to charge that the affidavit of Sloan did not state that Burris & Bennett had failed to deliver the ties, but that they claimed that they had failed to deliver them. The request was refused, and an exception taken. Had it been a request to charge the jury as to a correct legal proposition, based upon the affidavit, it would have been the duty of the court to comply with it. Again, had the request been to state to the jury how the affidavits read in a given particular, or correctly citing it in that particular, or to repeat to the jury so much of the affidavit, it would have been discretionary with the court to have complied with the request or not, the jury being supposed to know the contents of the document already; but the request was what in this doubtless was an inadvertence on the part of the counsel, who presented it to misstate to the jury the document in the same particular; for the request attributed to the affidavit a passage which it do not contain, and denied to it a passage which it did contain. The court, therefore, properly refused the request.

The defendant moved for a new trial upon grounds which have been disposed of, except the two following: one that the verdict was against the weight of evidence, the other that it was excessive. As to the first of these two grounds, where an appellate court is empowered to revise upon the facts, it can never reverse them, simply because upon the evidence, as submitted to it, it would have arrived at a different conclusion, and can only reverse where the verdict —or if the trial was by court, without a jury, the findings

below, were so clearly against the weight of evidence that no mind of fair intelligence, faithfully exercised, can be reasonably supposed to have arrived at the result which is complained of, or to state the rule in a different form, but as conveying the same idea, where the evidence to such a mind, so exercised, tends to an opposite conclusion.

This rule is not simply founded in the habitual respect which is due from the appellate to the inferior court, but in the very necessities of justice a less stringent rule would inevitably invite every appellant to a new trial upon the facts in the appellate court. We are clear upon two simple considerations, without alluding to other significant ones, that Woods was entitled to recover. The evidence of the defense, though not necessarily going so far, pretty plainly indicates that Woods wanted security before he parted with his title, and is positive and full that the company refused to give any, and wanted his ties without incurring any risk to him for them. It certainly would have been remarkable if Woods had still parted with his title to vendees, whose responsibility he distrusted, upon a sure chance for possible funds of theirs in the company's hands, over which he had no control. This rather strengthens the theory of a conditional sale. But, further, Woods and Bennett testify fully and distinctly to the conditional sale. The only adverse witness on that point was Beard; the plaintiff was interested, but Beard was an agent of the defendant, and Bennett disinterested; apparently, the fair balance of testimony was in favor of a conditional sale.

As to the second of these two grounds, the market price when the company sold to Coe & Carter these ties, was not less than twenty cents a tie; that, with interest at date of the verdict, would have brought the recovery up to about six hundred and fifty dollars. The verdict at five hundred and forty-two dollars and fifty cents can be accounted for only upon the supposition that the jury allowed something as paid to Woods by Beard. We have a grave doubt whether the allowance was proper, and whether the verdict

was not too small.   If that be so, this error of the jury was a clear gain to the defendant.   We see no excess in the verdict.

The exceptions to the order overruling the motion for a new trial is thus disposed of, and the judgment below affirmed, but without the five per cent. allowance applicable to dilatory appeals.